## Land v. Land.

Oct. 17, 1939.

A. F. Byrd for appellant.
Hugh Riddell for appellee.

OPINION OF THE COURT BY JUDGE PERRY—Reversing.

The appellant, Cora Arthur Land, basing her action mainly on the ground of cruel and inhuman treatment, brought this suit against her husband, Robert Land, for divorce and alimony (pendente lite and permanent), for restoration of her property taken over and used by her husband during their marriage, and for her costs, including a reasonable attorney's fee.

Defendant filed his answer and counterclaim, denying the allegations of the petition and asking a divorce from plaintiff on the ground of plaintiff's conduct in not living with him as his wife for more than a year, amounting to her abandonment of him, and on the further charge of "adultery and such lewd and lascivious conduct as proves her to be a harlot."

Upon final hearing, the chancellor adjudged that plaintiff recover of defendant, Robert Land, $320.41, which sum was received by plaintiff from her father's estate and used by defendant in his business, and that she was entitled to possession of the dwelling house "or tenant at a reasonable rent" until same was paid. He further adjudged that plaintiff was not entitled to any other relief prayed for and dismissed her petition and amended petition.

On the counter-claim of defendant, the chancellor adjudged that defendant was entitled to a divorce and,

further, that he pay plaintiff's costs, including an attorney's fee in the amount of $50.

Plaintiff appeals.

The rule as to appeals from judgments rendered in divorce actions is, as announced in Caudill v. Caudill, 172 Ky. 460, 189 S. W. 431, 432, that:

"While we have no power to reverse a decree of divorce, we may review the correctness of the decree for the purpose of determining whether or not alimony was properly awarded or refused, or the custody of children was properly bestowed. Anderson v.Anderson, 152 Ky. 773, 154 S. W. 1; White v. White, 152 Ky. 769, 154 S. W. 33; Davis v. Davis, 86 Ky. 32, 4 S. W. 822, 9 Ky. Law Rep. 300. And in case it appears that the divorce was improperly granted to the husband and the wife has no sufficient estate of her own, the court may award her reasonable alimony out of the husband's income or estate. Coleman v. Coleman, 164 Ky. 709, 176 S. W. 186."

The facts presented in the instant case, as disclosed by the record, are, briefly, that in September, 1913, the plaintiff (then employed as a teacher in the county schools) married the defendant, who was then a widower and nearly twenty years her senior, and that, up until about two years before the filing of this suit, they lived together as man and wife in Estill county, Kentucky.

Plaintiff testifies that they had acquired and owned a residence and a store building, wherein they conducted a merchandise business, which most of the time they found quite profitable; that for some years after their marriage, they lived in the residence, where she kept house, doing her own housework and cooking, and raised chickens and other things, but that about two years prior to the filing of her suit, the defendant had grown querulous, glum and abusive in speech and manner to the plaintiff and that he had fixed up a bedroom at the store, about a quarter of a mile distant from their home, where he has since lived and slept, only coming to the home for his meals, which she has prepared for him.

Plaintiff further testifies that, in addition to looking after their home, she clerked at the store during the afternoons and that, while no children were born to their marriage, she continued to devote her interest and

energies to caring for him and assisting at the store, in spite of the fact that her husband had grown surly towards and critical of her and had in effect abandoned her, by failing and refusing, during such time, to continue their marital relations.

Such account given by the plaintiff of the strained relationship existing between her and defendant, that there had been an alienation of all affection on the part of the husband for plaintiff and that he had deserted his home and wife, except for having her serve his meals there, is corroborated by the testimony of her witness, Viola Rawlins, who states that she stayed at plaintiff's home during the day, when defendant would come to his dinner, but that he would not give his wife "much of a good word;" that she heard him swear just about every time he came in and that when he came to the house for his meals, he would often "kick the chairs."

Further, both plaintiff and her mother testify that about two or three weeks before the filing of this suit, the plaintiff, on hearing that her mother, who lived in Lexington, was very ill, at once went to her and stayed with her for a week or more; that her mother having improved, she brought her back to stay with her awhile at her home. They also testify that upon their arrival there, when starting into the home, they were met by the defendant, who flourished a pistol threateningly in plaintiff's face and told her she could not stay there any more and that she would have to get out; that when she protested and answered that she intended to stay, he told her that if she stayed, he "would give her plenty of it," meaning, as she thought, that he would shoot her. Plaintiff further testifies that she and her mother then returned to Lexington, where she has since been living.

Appellant further testifies that she received some $565 from oil royalties and the sale proceeds of certain lands she inherited from her father's estate, which amount was taken over and used by the husband and partly put into their store business; also, that while helping at the store, she drew no pay for her services but would at times take small amounts of money, with which to purchase things needed by her, to which the defendant strongly objected. She further states that while money was scarce some times during the operation of their business, generally it was profitable and at times very profitable for them. She estimated the market

value of the store property, and the home, which they had acquired during their married life together, to be some $2,500. Also the wife testified that her husband was a veteran, who served in the U. S. army from October, 1899, to July, 1901; that he was in the war with Spain and is now entitled to and receives a pension benefit at the rate of $50 a month, in addition to the monthly income he realizes from operating his store.

On the other hand, defendant contradicts much of plaintiff's testimony as to having abandoned her and having refused to live with her in their home. He states that he tried to get appellant to come to the store, where he had a bed and stayed to protect the store, but that she refused to leave her residence and live at the store with him. Further he states that he has but little property and only a small income and has had to borrow $400 on his residence and $200 on his store to meet his obligations, including hospital bills incurred by reason of his gallstone affliction and his having undergone an operation therefor and also by reason of his wife having also undergone an operation.

He testifies that plaintiff went away from him frequently and that he did not object to her taking any money from the store.

Defendant admits that when plaintiff returned home from Lexington with her mother that he had a pistol in his hand, but says he made no threats. However, when asked the leading question, "You did not take the pistol to shoot anybody, did you?" his answer was, "She had threatened me."

Further defendant attempted to exculpate himself from these practically admitted charges of mistreatment, threats, loss of affection and abandonment of his wife for some three years, made against him by his wife, by raising the hue and cry of unsustained slanderous charges against her, to this end charging her with adultery and lewd and lascivious conduct, branding her a harlot.

He undertakes to bolster up and support the same by testifying that he found and has in his possession four unsigned notes, which were written his wife by some philanderer, who he states is none other than his neighbor and customer, Johnnie Sparks. He states these seductive notes, written by Sparks to his wife, show that they were having clandestine and illicit trysts

and secret meetings. He states that he recognizes the handwriting of these notes, he claims to have covertly taken from his wife's pocketbook, as being that of Johnnie Sparks, and that it was the last of them which roused his ire and made a cruel Othello of him.

The last of these notes, all written in much the same mushy manner and crude wording, is as follows:

"Dear friend can i see you at 3 a. m. in the morning in the frunt yard all will he be there i have sumpthin to tell you. From your frind."

The third of these notes, addressed to no one and signed by no one, carried, he claims, this seductive message to his wife:

"Hellow sweet hart how are you Bless your hart I would like to see you some where and talk with you a while. could you come over in the low gap in the morning about 8:30 if you can put up your little to night and I will go hunting in the morning and wait you where want to go where did you go last wednesday night I was there but could not find any one."

Defendant, other than saying that he recognized the handwriting of these notes and put it at his neighbor Sparks' door, never introduced any evidence to establish Sparks' authorship of these intriguing sonnets.

Further, defendant accuses his wife of having gone to Lexington for a purpose other than to wait upon her sick mother, and states that her report of that was a "g. d. lie," and that her trip on that occasion was for the purpose of meeting Johnnie Sparks and indulging in sex rapport with him.

He does not claim to have ever seen his wife and Sparks together, or taking a trip together, but states as grounds for his suspicion that Sparks and his wife did take a trip together, that they were seen traveling on the same train.

Sparks testifies that he knew nothing about these notes and had not written them and that he had never had nor attempted to have any secret or other meetings with the plaintiff. Also the wife says that she never took a trip with Sparks, or any other man, by prearrangement or otherwise, though it might have been that upon some of the trips made by her to various homes

and places, as to which defendant was told before her going, Sparks was also traveling on the train, but if so, that she never saw him nor was with him and never even knew of his being on the train.

Of course, in view of such being the feeling and aversion held by the defendant for his wife during this period he claims these secret messages were sent his wife, he could have, in addition to his mistreatment of her, his threatening her with a pistol and his refusing to live with her in their home, planted these unsigned notes with the purpose of destroying and disgracing her as a lewd woman or, as branded by him, a harlot.

Clearly the venomous character of defendant's accusations and charges made against the chastity of his wife, when unsupported by any substantial and probative evidence, in itself constitutes cruel and inhuman treatment of her.

Defendant attempts further to maintain the truth of these accusations against his wife by the empty and frivolous testimony of one or two of his neighbors, who testified to the questions asked them that they had frequently at night, when looking in the direction of plaintiff's little home, where she was left alone through the night with many misgivings and scary forebodings, seen the house brightly lighted and then it would be followed by sudden darkness.

Witnesses stated that this was all they saw, and some of them added that this same striking coincidence could be observed in their own homes, where the wives would frequently leave the lights burning up until ten or eleven o'clock at night or, upon being aroused by some thought or unusual noise, would turn on the lights to investigate.

Plaintiff readily admitted that she too, when alone in her home throughout the night, would generally leave the lamp burning until nine or ten o'clock and that frequently thereafter, upon hearing some unusual noise and becoming frightened, she would relight her lamp to investigate its cause.

We are therefore of the opinion that the defendant's evidence, offered in support of his alleged grounds of divorce, asked in his counter-claim, in no wise preponderates nor is it sufficient, as we view it, to sustain either of his grounds, of adultery or abandonment on the part

of his wife, and that the court erred in adjudging him entitled to a divorce and in denying the wife alimony.

But, as stated above, while recognizing that we have no power under Section 950-1, Kentucky Statutes, to reverse the decree of divorce here granted the husband, we are nevertheless authorized to and may consider the evidence with a view to determining whether or not the court's ruling, denying the wife alimony, was under the conflicting evidence heard here proper.

The situation here presented is very similar in its facts to that presented in White v. White, 152 Ky. 769, 154 S. W. 33, 34, where both the husband and wife had asked a divorce on the grounds of abandonment and the chancellor, upon conflicting evidence heard, adjudged the husband a divorce and refused to allow alimony to the wife. Upon our review of such ruling, we said:

"This is not a case where the judgment of the chancellor should be upheld because the evidence is conflicting, and upon a consideration of the whole case the mind is left in doubt, but a case where the overwhelming weight of the evidence is in favor of the defendant, and leaves no doubt that plaintiff abandoned her.

"Under these circumstances, defendant is clearly entitled to alimony, and the mere fact that plaintiff is a poor man and has no property is no reason for denying her relief, when, as the record shows, he is able-bodied and capable of earning wages."

While in the instant case the husband is not a strong and able-bodied man, as was found in the White case, supra, it is yet shown that he has an income from his veteran's pension of $50 a month, which is further increased by the profits realized by him from his store business, which the evidence shows he is able to and does profitably conduct.

Here too the situation of the parties and the discord, unhappiness and severing of their marital relations which has unfortunately ensued, must, we conceive, be attributed to the husband's mistreatment of the wife, in leaving her to live alone, for some three years before the bringing of this action, in their little residence, while he chose to live apart from her at his store. Such abandonment of the marital relation was caused by and clearly arose from the defendant's having formed an

aversion for his wife, due to his loss of all affection for her, which the evidence very strongly tends to show produced this situation. This inference was not rebutted by any substantial evidence tending to support his accusations made of improper conduct and disloyalty on the part of the wife, either as having abandoned him or as having been guilty of improper and lewd conduct with Johnnie Sparks or any man.

Upon our review of the facts and similar situation presented in the late case of Hayes v. Hayes, 275 Ky. 273, 121 S. W. (2d) 698, 699, where, in a suit for alimony, the husband filed counter-claim for divorce, it was again said by us that:

"It is apparent, however, that appellee had lost all affection for his wife, and that during recent years her life with him had been unpleasant. The proof on the question of abandonment is conflicting, but the preponderance of the evidence supports the appellant's claim that appellee notified her not to return to his home shortly after she went to her mother's home on February 19, 1936. We think the facts were insufficient to entitle the appellee to divorce on the ground of abandonment, but, even if the conduct of the appellant was not entirely blameless, it was not of such character as to deprive her of the right to alimony. The appellee's attitude toward his wife (just as we here conclude) undoubtedly was the impelling cause of the separation. As said in Green v. Green, 152 Ky. 486, 153 S. W. 775, 777:

" 'In questions relating to alimony the court is not called upon to compare these imperfect sympathies so as to determine, with certainty, which was most at fault; but where there is no moral delinquency on the wife's part (as we here conceive the husband's evidence is clearly insufficient to establish), it is a sufficient ground for giving her alimony that the husband, being the support of the family, was a substantial participant in the shortcomings which led to the separation.' " (Parentheses ours.)

So here, as there, we are led, upon a careful consideration of the whole case when taking into consideration the circumstances and conditions of the parties, to conclude that the defendant should pay his wife alimony at the rate of $25 a month, such amount being, we con-

ceive, not more than one-third of the husband's monthly income he receives from his pension and store business and the wife having no income or means of self-support whatever.

Therefore, that part of the learned trial court's judgment denying an allowance of permanent alimony to the wife is reversed and cause remanded with directions to enter a judgment in conformity with this opinion.